**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES R. MISCHKA, | ) | CASE NO. 13-CV-1881 |
| | ) | |
| Plaintiff, | ) | JUDGE LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | | |

Plaintiff, James R. Mischka ("Plaintiff"), challenges the final decision of

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security

("Commissioner"), denying his applications Period of Disability ("POD"), Disability

Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II

and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This

case is before the undersigned United States Magistrate Judge pursuant to an

automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the

reasons set forth below, the Magistrate Judge recommends that the Commissioner's

final decisions be AFFIRMED.

## I.   INTRODUCTION

Plaintiff challenges two final decisions of the Commissioner.  (Plaintiff's Brief ("Pl.

Br.") at 1, Doc. No. 24.)  The relevant record includes three administrative hearing

transcripts, three decisions by different administrative law judges ("ALJs"), and medical

records from two relevant periods of time. Rather than devoting separate sections to the

procedural history of Plaintiff's various applications; the medical evidence; and the ALJs' various findings, this Report and Recommendation presents the relevant information in a chronological manner, organized according to the final decision at issue.

## II.    BACKGROUND

### A.    Plaintiff's March 2006 Application - ALJs Quigley and West

In March 2006, Plaintiff filed an application for POD and DIB, alleging an onset date of March 10, 2006 ("March 2006 Application").  (Administrative Transcript ("Tr.") 359.)  The claim was denied initially and upon reconsideration.  (*Id*.)  Plaintiff requested a hearing before an ALJ.  (*Id*.)  On August 14, 2008, ALJ James J. Quigley conducted a hearing.  (*Id*.)  Plaintiff was represented by counsel and testified at the hearing.  (*Id*.)  A vocational expert ("VE") also testified at the hearing.  (*Id*.)  In addition to the testimony, the ALJ considered the evidence as described below.

#### 1.    Evidence

##### a.    Personal and Vocational Evidence

Plaintiff was born in December 1961 and was 41 years old on the date that he filed his March 2006 Application.  (Tr. 367.)  He had at least a high school education and could communicate in English.  (*Id*.)  Plaintiff had prior work as an auto assembler, assembler, recycler, and packager.  (Tr. 366.)

##### b.    Medical Evidence

###### i.    Plaintiff's Providers

A July 2002 scan of Plaintiff's left hip revealed evidence of "old necrosis or trauma" to the left femoral head.  (Tr. 588.)  That same month, Parminder Singh, M.D.,

2

diagnosed Plaintiff with scoliosis and left knee pain.  (Tr. 595.)  Dr. Singh also noted that

Plaintiff's pelvis "tilt[ed]" up to the left, resulting in pain in Plaintiff's left knee.  (*Id*.)  In

December 2002, Plaintiff reported to Dr. Singh that a different physician had told him he

needed surgery for hip pain.  (Tr. 591.)  At that time, Dr. Singh completed a county

agency basic medical assessment form, in which he noted Plaintiff's diagnoses of

scoliosis and avascular necrosis of the left hip.  (Tr. 592.)  Dr. Singh opined that

Plaintiff's symptoms were "good/stable" with treatment.  (*Id*.)  Dr. Singh indicated that

Plaintiff could walk for two hours in an eight-hour workday and could walk for one hour

without interruption.  (Tr. 593.)  He concluded that Plaintiff was: moderately limited in his

ability to push/pull, bend and use repetitive foot movements; not significantly limited in

his ability to handle; and had no limitations in his ability to reach, see, hear and speak.

(*Id*.)  Dr. Singh opined that Plaintiff was "unemployable."  (*Id*.)

On March 24, 2003, Plaintiff underwent a total left hip replacement.  (Tr. 598.)

The operative report noted a diagnosis of degenerative joint disease of the left hip.  (*Id*.)

After the surgery, Plaintiff was transported to a nursing home in stable condition.  (*Id*.)

The surgeon, William Asa Seeds, M.D., noted that, post-operatively, Plaintiff should be

"weightbearing [*sic*] as tolerated."  (Tr. 605.)  On April 23, 2003, Plaintiff was discharged

from the nursing home, with diagnoses of osteoarthritis and anemia.  (Tr. 614.)

On July 2, 2003, Plaintiff reported to Dr. Seeds that his hip was "progressing

well," although he was experiencing some swelling in his left knee.  (Tr. 644.)  Dr.

Seeds explained to Plaintiff that the left knee pain "goes along with the weightbearing

[*sic*] of [the left leg] that he is now experiencing."  (Tr. 645.)  Scans of Plaintiff's left hip

showed stable components with no abnormalities.  (Tr. 646.)

3

On August 5, 2004, emergency personnel brought Plaintiff to the emergency department at Brown Memorial Hospital after he had been struck by a vehicle while riding his bicycle.  (Tr. 672.)  Plaintiff reported that he had drunk between eight and ten beers that day.  (*Id*.)  Emergency department staff diagnosed Plaintiff with multiple rib fractures and a fractured clavicle.  (*Id*.)

On August 29, 2005, Plaintiff reported to the emergency department at Brown Memorial Hospital.  (Tr. 661.)  The summary of his visit noted that Plaintiff was "riding his bicycle inebriated and was struck by a car."  (*Id*.)  After being admitted for one night for observation, Plaintiff was diagnosed with a closed head injury, and discharged in stable condition with instructions to follow up with his family physician.  (*Id*.)

### ii.    Agency Reports

On July 3, 2006, agency consulting psychologist Richard C. Halas, M.A., examined Plaintiff.  (Tr. 696-703.)  Halas noted that Plaintiff was "closely accompanied" by his brother-in-law, and had "a flat, hesitant, tense and anxious presentation."  (Tr. 696.)  Plaintiff reported that he was active in the Moose Lodge, and read the newspaper and watched the news and other television programs.  (Tr. 699.)  Halas performed the Weschler Adult Intelligence Test III ("WAIS-III"), and noted that Plaintiff had a verbal IQ that was in the borderline range of intellectual functioning, and that Plaintiff's performance and full scale IQ scores were "in the extremely low range of intellectual functioning," placing Plaintiff in the first percentile when compared with the general population.  (*Id*.)  Halas opined that Plaintiff was "significantly below average" in: the ability to work in a rapid and accurate manner in the substitution test; the perception of pertinent missing details; the conceptualization of abstract forms; matrix reasoning;

4

social understanding; social awareness; verbal abstractions; mathematical skills; common sense judgment; current fund of information; and concentration skills.  (*Id*.) Halas noted that Plaintiff had average vocabulary skills, but "narrow and constricted" concentration skills.  (*Id*.)  Halas opined that Plaintiff's test scores were "inconsistent with [Plaintiff's] previous placement in regular classes and his life functioning levels." (Tr. 700.)

Halas diagnosed Plaintiff with alcohol abuse disorder, currently in remission; and borderline intellectual functioning, noting that Plaintiff "does not meet the criterion for Mild Mental Retardation despite a full scale IQ of 66."  (*Id*.)  Halas assigned Plaintiff marked limitations in the ability to: relate to others, including peers, supervisors, and the general public; and withstand the stresses and pressures associated with most day-to-day work settings.  (Tr. 700-01.)  He opined that Plaintiff was moderately limited in the ability to follow through with simple one and two-step instructions or directions, and had no limitation in the ability to maintain attention and do simple repetitive tasks.  (Tr. 700-01.)  The WAIS-III testing revealed a verbal IQ score of 71, a performance IQ score of 67, and a full scale IQ score of 66.  (Tr. 702.)

On July 20, 2006, consulting psychologist Steven J. Meyer, Ph.D., performed a mental residual functional capacity ("RFC") assessment.  (Tr. 704-06.)  He assigned Plaintiff moderate limitations in the ability to: carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with

5

the general public; accept instructions and criticism from supervisors; and respond appropriately to changes in the work setting.  (Tr. 704-05.)  Meyer made the following conclusions in section III of the form:

> Based on [Plaintiff's] mental status testing, he appears able to understand, remember, follow, and maintain concentration, persistence and pace for one and two-step instructions.  The consultative examiner opines that [Plaintiff] has marked limitation in ability to relate to others.  Although [Plaintiff] was anxious, he was able to relate well with the consultative examiner and his attendance at the Moose Lodge every day suggests that his . . . ability to function socially is adequate for brief, superficial interactions with coworkers and supervisors.  Due to his anxiety it would be best if [Plaintiff] did not work with the public.  The consultative examiner also suggests that [Plaintiff] has marked limitation in ability to withstand stresses and pressures associated with most day-to-day work settings. Since [Plaintiff] was able to sustain through the consultative exam and IQ testing, this suggests that his impairment in this areas is more in the moderate range. [Plaintiff] would perform best in a work setting with simple/moderately complex routine, that [Plaintiff] is motivated to perform, no strict production quotas, regular expectations and few changes.

(Tr. 706.)

In a psychiatric review technique, Dr. Meyer opined that Plaintiff had borderline intellectual functioning and anxiety disorder (not otherwise specified).  (Tr. 709, 713.) He assigned Plaintiff moderate limitations in maintaining social functioning and maintaining concentration, persistence or pace; and mild limitations in activities of daily living.  (Tr. 718.)

On August 14, 2006, consulting physician Ata Ulhaq, M.D., examined Plaintiff. (Tr. 726-30.)  Dr. Ulhaq made the following observations:

> The patient has a very flat affect and even though his Beck's

6

> depression inventory scored high at 33 points, it is apparent
> that he has mental retardation.  Even though he says he
> finished high school and had multiple small jobs, he is not
> able to comprehend very well on small questions relating to
> meaning of words and comprehension of his own disability.
> He is unable to do simple addition, multiplication and
> division.  He was also having difficulty spelling some words.
> Because of this, I have a feeling that this is a disability
> arising more than from his hip.

(Tr. 727.)  Plaintiff complained of pain in his hips, and examination revealed pain on

lateral rotation and tilting of the hip.  (Tr. 729.)  Abduction/adduction and

flexion/extension were all limited with pain, more on the left than on the right.  (*Id*.)  Dr.

Ulhaq listed the following clinical impressions: mental retardation with moderate

depression; possible problems with alcohol; poor social support system; congenital

heart problems, possible aortic bicuspid valve regurgitation; hypertension; degenerative

disease of his hips, possible dysplasia or avascular necrosis.  (*Id*.)  She recommended,

*inter alias*, that Plaintiff undergo: (1) evaluation "of his mental retardation and moderate

depression"; and (2) rehabilitation to find some sort of job where he can sit because of

his hips."  (Tr. 730.)

On September 21, 2006, consulting physician Gerald Klyop, M.D., performed a

physical RFC assessment.  (Tr. 731-38.)  He opined that Plaintiff could: lift 10 pounds

occasionally and less than 10 pounds frequently; stand and/or walk for at least two

hours in an eight-hour workday; and sit for about six hours in an eight-hour workday.

(Tr. 732.)  He observed that Plaintiff had a limited ability to push and/or pull with his

lower extremities.  (*Id*.)  Specifically, he noted that Plaintiff should not use foot controls

with either of his lower extremities.  (Tr. 733.)  Dr. Klyop concluded that Plaintiff could

never: climb ladders, ropes or scaffolds; kneel; crouch; or crawl.  (*Id*.)  He opined that

7

Plaintiff could occasionally climb ramps and stairs, and balance, and could frequently stoop. (*Id.*)

### c. August 2008 Administrative Hearing Testimony

#### i. Plaintiff's Hearing Testimony

At his August 14, 2008 administrative hearing, Plaintiff testified as follows:

He could not recall his street address, although he could remember the name of the street on which he lived. (Tr. 381.) He lived with his uncle. (Tr. 382.) Plaintiff occasionally worked as a fill-in bar tender for the Moose lodge, and assisted the regular bar tenders by taking out the trash at the end of the night. (Tr. 383, 385.) He also mowed lawns. (Tr. 384.) At the Moose lodge, he talked to people about sports. (Tr. 385.) Plaintiff averaged a C grade point average in school. (Tr. 386.) He had worked for one year at a leather company, hanging hides to dry out. (Tr. 387-88.) He had trouble remembering what he had read. (Tr. 389.) He had lived on his own for only two years of his life, when he lived in a trailer owned by his father. (Tr. 390.) Otherwise, he had lived with this parents, his sister, or his uncle. (Tr. 390-91.)

#### ii. Tammy Lucas's Hearing Testimony

Plaintiff's sister, Tammy Lucas, testified as follows:

Plaintiff had always had the mentality of a 12-year old. (Tr. 392.) When he lived with Ms. Lucas, she would have to remind him to clean his room and take a shower. (*Id.*) She and her husband had asked him to move out "because he has a problem urinating in bottles, and sometimes going to the bathroom in bags." (Tr. 394.) Plaintiff had almost burned down Ms. Lucas's house with the stove. (*Id.*) Plaintiff had difficulty

8

finding and retaining work due to "the way he talks and, or communicates with people."

(*Id*.)  Plaintiff was "afraid to use the phone," and wouldn't call off sick to an employer.

(*Id*.)  Plaintiff attended special classes in math and reading when he was in school.  (*Id*.)

His parents never sought any intelligence or psychological testing because their mother

"didn't want to accept it.  And she would say, he's just a little odd or a little off." (Tr. 394-

95.)

Plaintiff lived alone in his father's trailer.  (Tr. 395.)  Plaintiff never paid the rent

and would "turn up the tv and ignore" the landlord when he came to collect it.  (*Id*.)

Eventually, Plaintiff was evicted and moved in with Ms. Lucas.  (*Id*.)  Ms. Lucas recalled

that Plaintiff received Ds and Fs in school, but opined that her brother "thinks he's being

honest" when he testified otherwise.  (*Id*.)

### iii.    Vocational Expert Testimony

ALJ Quigley described the following hypothetical person with the same age,

education and work experience as Plaintiff:

> [C]ould lift up to 20 pounds, but then only on an occasional
> basis, 10 pounds on a frequent basis.  Would perform jobs,
> who would be able to sit for at least 6 hours during the
> course of an 8 hour day, stand for no more than 2 hours,
> would be able to remember, understand and carry out
> normal and simple instructions, make simple work related
> decisions, and could do that on a sustained and continuous
> basis, could do jobs that did not involve any more than brief
> superficial contact with coworkers, no interactions with the
> general public, and could do jobs that . . . did not involve any
> crawling, kneeling, crouching, did not involve any rapid
> assembly line work, or high production quotas, no more than
> 8 hours of work in a shift.

(Tr. 403.)  The ALJ opined that the hypothetical person could perform work as an office

helper, unarmed security guard, or unskilled office clerk.  (Tr. 404.)

9

The ALJ added the additional limitation that the hypothetical individual would be "able to remember, understand and carry out no mroe than simple instructions, make simple work related decisions, couldn't do that on a sustained and continuous basis with[out] interruptions from psychologically based symptoms, [and] being overwhelmed by simple two, three step activities so that there would be a significant number fo work stoppages during the course of a day and work week." (Tr. 404-05.)  The VE opined that the hypothetical individual would not be able to perform any work.  (Tr. 405.)

In response to questioning by Plaintiff's counsel, the ALJ opined that, with the additional limitation that the hypothetical individual had borderline intellectual functioning, the hypothetical individual would not be able to perform any work.  (*Id*.)

### 2.    Summary of ALJ Quigley's Decision

On October 30, 2008, ALJ Quigley issued a decision denying Plaintiff's applications on the basis that he was not disabled.  (Tr. 359-68.)  ALJ Quigley made the following relevant findings of fact and conclusions of law:

1.    Plaintiff's date last insured was December 31, 2007.

* * *

3.    Through the date last insured, Plaintiff had the severe impairments of anxiety disorder, borderline intellectual functioning, status post left total hip replacement, and right foot deformity.

4.    Through the date last insured, Plaintiff did not have an impairment or a combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    Plaintiff had the RFC to perform a limited range of light work, involving lifting up to 20 pounds occasionally and 10 pounds frequently, sitting for up to 6 hours, and standing/walking for up to 2 hours.  Plaintiff can perform jobs that require no kneeling, crouching or crawling.  Plaintiff is able to remember, understand and carry out no more than simple instructions and make simple work-related

10

decisions.  He can perform jobs that require no more than brief, superficial contacts with co-workers and supervisors, and no interaction with the general public.  He can perform activities that do not expose him to high production rate quotas, rapid assembly line work or require him to work more than eight hours in a shift.

*  *  *

10.     Through the date last insured, considering Plaintiff's age, education, work history and RFC, Plaintiff was capable of performing work that existed in significant numbers in the national economy, including officer helper, unarmed security guard, surveillance systems monitor, and office clerk.

(Tr. 361-67.)

Plaintiff requested Appeals Council review of ALJ Quigley's October 2008 decision, which the Appeals Council denied on August 8, 2009, making ALJ Quigley's decision the final decision of the Commissioner. (Tr. 351.)

### 3.     Proceedings in this Court

In October 2009, Plaintiff filed a complaint in this Court challenging the Commissioner's final decision denying his March 2006 application.  (*See* USDC Dkt. No. 09-cv-2291.)  On July 13, 2010, United States Magistrate Judge Greg White reversed and remanded the decision, finding that the ALJ had failed to explain his findings:

> The ALJ's decision is replete with inadequately explained findings.  Most notable is the ALJ's failure to adequately discuss the weight given to the expert opinions of state agency physicians.  The ALJ acknowledged that cognitive testing performed by Halas suggested that [Plaintiff] had borderline intellectual functioning based on his full scale IQ of 66. . . . Nonetheless, the ALJ neither included this finding in the mental RFC analysis, nor explained the reasons for discounting the opinion.  Given that the VE expressly testified that an IQ of 66 would render [Plaintiff] unemployable, the absence of any discussion on this issue undermines the decision as a whole.

11

* * *

In conclusion, this Court cannot determine what weight, if
any, the ALJ ascribed to the IQ testing performed by Halas.

*Mischka v. Astrue*, No. 1:09-CV-2291, 2010 WL 2759651, **6-7 (N.D. Ohio July 13,
2010).  Magistrate Judge White remanded the case "for a new decision that:(1) fully

explains the weight given to the opinions of *all* the State Agency medical and

psychological consultations of record, (2) fully incorporates those limitations accepted

as valid into an accurate hypothetical, and (3) complies with all of the Social Security

Administration's regulations and rulings." *Id.* at *7.

### 4.    Administrative Hearing on Remand

On March 22, 2011, on remand from Judge White's decision, ALJ William T. Vest

conducted an administrative hearing, at which Plaintiff was represented by counsel and

testified.  (Tr. 326.)  A VE also testified.  (*Id.*)

### a.    Plaintiff's Hearing Testimony

At that hearing, Plaintiff testified as follows:

He had lived with his uncle for two years.  (Tr. 331.)  He was unable to work due

to pain in his hip and because he could not lift more than 10 pounds.  (Tr. 332.)  He

worked odd jobs, mostly mowing lawns, when someone would hire him to do so. (Tr.

332-33.)  Plaintiff washed the dishes at home.  (Tr. 333.)  He last had a driver's license

in 1994, and he no longer had his license as a result of a DUI.  (*Id.*)  Plaintiff still drank

alcohol when he could afford it.  (Tr. 333-34.)

Plaintiff rode his bike, and could ride for about an hour.  (Tr. 336.)  He turned in

recyclables to get money to buy "chewers."  (Tr. 337.)  Plaintiff had difficulty

12

remembering.  (Tr. 338.)  When he was working, someone had to show him how to do his job every day.  (Tr. 339.)

### b.    Vocational Expert Testimony

The ALJ described the following hypothetical individual to the VE:

> [P]ossess[es] an [RFC] of light work as defined in the regulations, this individual can lift or carry 10 pounds frequently, 20 pounds occasionally, can sit for eight hours in an eight hour day, walk or stand six hours in an eight hour day, but should be [inaudible] to change positions each 30 minutes.  Only occasional bending or squatting.  No climbing, and this individual is limited to simple, repetitive non-production step one, two, three, jobs.

(Tr. 342.)  The VE opined that the hypothetical individual would be able to work as a bench assembler, machine feeder or off bearer.  (Tr. 343.)  Plaintiff's counsel inquired whether any jobs existed that would allow for the additional limitation that the hypothetical individual would require special supervision more than a minimum of 20 percent of the time.  (Tr. 345.)  The VE opined that no such jobs existed.  (*Id*.)

### 5.    Summary of ALJ Vest's Decision

On April 4, 2011, ALJ Vest issued a decision denying Plaintiff's March 2006 applications on the basis that Plaintiff was not disabled.  (Tr. 42-52.)  ALJ Vest made the following relevant findings of fact and conclusions of law:

1.    Plaintiff met the insured status requirements through March 31, 2008.

\*   \*   \*

3.    Through the date last insured, Plaintiff had the severe impairments of borderline intellectual functioning, anxiety disorder, status post left hip replacement, and right foot deformity.

4.    Through the date last insured, Plaintiff did not have an impairment or a combination of impairments that met or medically equaled one of the listed

13

impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.   Through the date last insured, Plaintiff had the RFC to perform light work, except that he required the opportunity to change positions every 30 minutes; he could engage in only occasional bending and squatting, and no climbing; and he was limited to simple, repetitive, non-production-oriented 1-,2-, and 3-step job tasks.

*   *   *

10.  Through the date last insured, considering Plaintiff's age, education, work history and RFC, Plaintiff was capable of performing work that existed in significant numbers in the national economy, including bench assembler, hand feeder and hand packer.

(Tr. 45-51.)

Plaintiff requested Appeals Council review of ALJ Quigley's October 2008 decision, which the Appeals Council denied on June 27, 2013, making ALJ Vest's decision the final decision of the Commissioner. (Tr. 5-8.)

**B.     Plaintiff's September 2009 Applications – ALJ Andreas**

In September 2009, after the Appeals Council denied his request for review of ALJ Quigley's decision, but before Plaintiff filed his complaint challenging that decision in this Court, Plaintiff filed another application for POD and DIB, as well as an application for SSI, alleging an onset date of October 28, 2008.  (Tr. 17.)  The applications were denied initially and upon reconsideration, and Plaintiff requested a hearing before an ALJ.  (*Id*.)  In December 2011, Plaintiff's counsel filed a motion requesting that Plaintiff receive additional intelligence testing, as well as adaptive behavior testing.  (Tr. 173-74.)

On December 9, 2011, ALJ Frederick Andreas conducted a hearing.  (*Id*.) Plaintiff was represented by counsel and testified at the hearing.  (*Id*.)  A vocational expert ("VE") also testified at the hearing.  (*Id*.)  ALJ Andreas denied Plaintiff's request

14

for additional testing, stating, "I don't have any treatment records or anything that would support that that would lead me to think there's any need for any additional evaluations." (Tr. 243.)  In addition to the testimony and the evidence already in Plaintiff's record, the ALJ considered the evidence as described below.

### 1. Evidence

#### a. Medical Evidence

On June 10, 2009, Richard Krajec, M.D., performed a Medicaid physical on Plaintiff.  (Tr. 183-85.)  Dr. Krajec offered the following impression/plan:

> [Plaintiff] is a 47-year-old white male who offers no physical complaints, although he has a stiff shoulder and wrist.  He does not quite move with his left side and upper extremities as well as his right side.  He seems to be mentally challenged.  Drinks heavily occasionally, but otherwise seems to be stable and capable of working.

(Tr. 185.)

On July 13, 2009, state agency consulting psychologist James Cozy, Ph.D., performed a mental RFC assessment for the Ohio Department of Jobs and Family Services.  (Tr. 186-87.)  He opined that Plaintiff was employable.  (Tr. 187.)  Dr. Cozy assigned Plaintiff extreme limitation in the ability to: maintain attention and concentration for extended periods; make simple, work-related decisions; and ask simple questions or request assistance.  (Tr. 186.)  He opined that Plaintiff was moderately limited in the ability to: remember locations and work-life procedures; understand and remember very short and simple instructions; remember detailed instructions; carry out very short and simple instructions; and carry out detailed instructions.  (*Id.*)

15

On November 2, 2009, agency consulting examiner Halas – who had examined Plaintiff in July 2006 – performed a second consultative examination.  (Tr. 189-92.)  Mr. Halas noted Plaintiff's flat, hesitant and anxious presentation.  (Tr. 189.)  He diagnosed Plaintiff with alcohol abuse disorder, anxiety disorder and borderline intellectual functioning.  (Tr. 192.)  Mr. Hallas opined that Plaintiff was moderately limited in his ability to: understand, remember and follow instructions and/or directions; relate to others, including fellow workers and supervisors; and withstand the stresses and pressures associated with day-to-day work settings.  (*Id.*)  He opined that Plaintiff was mildly impaired in his ability to maintain attention and concentration to perform simple, repetitive tasks.  (*Id.*)

On November 16, 2009, agency consulting psychiatrist Catherine Flynn, Psy.D., performed a psychiatric review technique.  (Tr. 193-206.)  She opined that Plaintiff was moderately limited in maintaining social functioning and concentration, persistence and pace; and was mildly limited in his activities of daily living.  (Tr. 203.)

### b.    Administrative Hearing Testimony

#### i.    Vocational Expert Testimony[1]

_____

[1] Neither the ALJ nor Plaintiff's counsel realized that Plaintiff was present at the hearing location, and proceeded with the hearing without Plaintiff in the hearing room. (Tr. 261.)  Plaintiff testified after the VE.

At the December 9, 2011 administrative hearing, the ALJ described the following hypothetical individual of Plaintiff's age, education and vocational background:

> [H]ad the [RFC] to perform the strength demands of light work, involving lifting and carrying 20 pounds occasionally and 10 pounds frequently, sitting for eight hours, standing and/or walking for six hours in an eight-hour day, with the opportunity ro change positions every 30 minutes as needed due to pain, and performing occasional bending and squatting, but no climbing.  He has . . . the mental RFC to perform only simple, repetitive, non-production oriented, one-, two-, and three-step job tasks.

(Tr. 255.)  The VE opined that the hypothetical individual would be able to perform work as a cashier, office helper or photocopy machine operator.  (Tr. 256.)  In response to questioning from Plaintiff's counsel, the VE opined that, with the additional limitation of being off task for at least 15 percent of the time, the hypothetical individual would not be able to perform any work.  (Tr. 257.)

### ii.    Plaintiff's Testimony

Plaintiff testified as follows:

He lived with his uncle.  (Tr. 262.)  He never lived alone because he could not afford it.  (Tr. 263.)  Other people ran the households in which he lived.  (Tr. 263-66.) Plaintiff had problems remembering and concentrating.  (Tr. 269.)  He read the sports page of the newspaper.  (Tr. 271.)  Plaintiff enjoyed being around people, unless they picked on him.  (Tr. 273-74.)

### 2.    Summary of ALJ Andreas's Decision

On January 15, 2012, Plaintiff's request for Appeals Council review of the ALJ decision denying his March 2006 application was still pending, ALJ Andreas issued a decision denying Plaintiff's September 2009 application for benefits on the basis that

17

Plaintiff was not disabled.  (Tr. 17-33.)  He again denied Plaintiff's request for additional

testing, finding that the medical evidence in the record did not merit additional

intelligence testing.  (Tr. 17.)  Further, with respect to the effect of ALJ Vest's decision

his consideration of Plaintiff's application, ALJ Andreas observed:

> [A] hearing was held before [ALJ Vest], who issued a
> decision on April 4, 2011 finding that [Plaintiff] was not
> disabled under [the Act.] There is no evidence that [Plaintiff]
> sought review of that decision.  The prior decision mandates
> consideration of *Drummond v. Commissioner*, 126 F.3d 837
> (6th Cir. 1997), [in which] the Court clearly stated that the
> doctrine of *res judicata* was applicable to administrative
> proceedings.  The Commissioner could not reach
> inconsistent results in a second proceeding based upon
> evidence that had already been weighed in an earlier
> proceeding.  That finality was applicable to findings as well
> as decisions.  In *Drummond*, the Court held that "[a]bsent
> evidence of an improvement in a claimant's condition, a
> subsequent ALJ is bound by the findings of a previous ALJ."
> Previously determined issues cannot be reexamined absent
> new and additional evidence or changed circumstances.
> Acquiescence Ruling 98-4(6).
>
> *   *   *
>
> The record does not contain new and material evidence
> establishing a change in condition. [Plaintiff] filed the current
> application while the previous application was pending at the
> District Court level.  Less than one year has elapsed
> [between the date on which] ALJ Vest issued his decision
> and my review of the record.  Although the current record
> contains evidence that was not before ALJ Vest, that
> evidence does not establish a change in condition. . . . [T]he
> current two additional mental capacity assessments do not
> demonstrate a worsening in [Plaintiff's] condition since the
> previous adjudication.  Likewise, the additional statements
> do not demonstrate that [Plaintiff's] functioning has
> deteriorated or significantly improved.  As the evidence does
> not establish a change in condition, I am bound by the
> previous decision.

(Tr. 17-18.)

ALJ Andreas made the following relevant findings of fact and conclusions of law:

1.     Plaintiff meets the insured status requirements of the Act through March 31, 2010.

* * *

3.     Through the date last insured, Plaintiff had the severe impairments of borderline intellectual functioning, anxiety disorder, status post left hip replacement, and right foot deformity.

4.     Through the date last insured, Plaintiff did not have an impairment or a combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.     Through the date last insured, Plaintiff had the RFC to perform light work. Specifically he can lift and carry up to 20 pounds occasionally and 10 pounds frequently.  In an eight-hour workday, he can stand and/or walk for six hours, with the opportunity to change positions every 30 minutes as needed due to pain.  He can occasionally bend and squat, but he cannot climb.  He has the mental RFC to perform only simple, repetitive, non-production-oriented 1-,2-, and 3-step job tasks.

* * *

10.    Through the date last insured, considering Plaintiff's age, education, work history and RFC, Plaintiff was capable of performing work that existed in significant numbers in the national economy, including cashier II, office helper, and photocopier operator.

(Tr. 20-33.)

### 3.    Proceedings Before the Appeals Council

#### a.    Request for Appeals Council Review

On March 28, 2012, Plaintiff's counsel requested review of ALJ Andreas's

January 2012 decision denying his September 2009 application.  (Tr. 290-91.)  In her

letter, counsel argued that ALJ Andreas abused his discretion when he denied Plaintiff's

19

request for additional IQ and behavioral testing.  (Tr. 290.)

### b.  January 2012 IQ Test Results

On April 2, 2012, Plaintiff's counsel submitted to the Appeals Council the results of IQ testing performed on Plaintiff in January 2012.  (Tr. 298, 304-05.)  The WAIS-III revealed a verbal IQ of 81, a performance IQ of 68, and a full scale IQ of 73.  (Tr. 304.) Plaintiff tested: below the first percentile in the domain of communication; in the fifth percentile in daily living skills; and in the third percentile in socialization and motor skills. (Tr. 305.)  His overall adaptive behavior composite score placed him in the first percentile.  (*Id.*)  Psychologist Thomas P. Lechowick, M.A., who reviewed the test results, concluded that Plaintiff had borderline intellectual functioning, with academic skills in the range from seventh through tenth grades.  (Tr. 303.)  Mr. Lechowick opined that Plaintiff's scores were "higher than what would be expected from his cognitive abilities.  Adaptively, [Plaintiff's] functioning was rated at overall within the mild range of mental retardation, although three of the four major domains were also in the borderline classification."  (*Id.*)

In her April 2, 2012 letter to the Appeals Council, Plaintiff's counsel requested that Plaintiff's pending requests for review – one related to ALJ Vest's denial of his March 2006 application and the other related to ALJ Andreas's denial of his September 2009 application – be consolidated.  (Tr. 298.)  On June 27, 2013, the Appeals Council declined Plaintiff's request for review of ALJ Andreas's decision denying his September 2009 applications.  (Tr. 9-11.)  Although the record does not contain a decision regarding Plaintiff's request to consolidate the two cases, the single administrative record prepared by the Agency contains records and decisions related to both cases.

20

### III.  CURRENT PROCEEDINGS IN THIS COURT

On August 26, 2013, Plaintiff filed his complaint to challenge the Commissioner's final decisions.  (Doc. No. 1.)  The parties have completed briefing in this matter.  (Doc. Nos. 20, 24, 25.)

### IV.  STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) and 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) and 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets

21

a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## V.   LAW & ANALYSIS

### A.   Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

22

(6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

## B.     Plaintiff's Assignments of Error

Plaintiff asserts the following assignments of error: (1) ALJ Vest did not abide by the law of the case doctrine because he failed to explain the weight given to all of the medical opinions in the record; (2) substantial evidence does not support ALJ Vest's determination of Plaintiff's RFC because ALJ Vest omitted the limitations identified by Dr. Uqhal and ALJ Vest failed to explain this omission; (3) ALJ Andreas improperly applied *Drummond*; (4) the Appeals Council erred in failing to advise Plaintiff whether it had considered his claim that ALJ Andreas abused his discretion; and (5) the January 2012 IQ test results constitute new evidence that merit remand in this case.

### 1.     ALJ Vest's Decision - Law of the Case

It is well settled that, where a federal district court has reversed the Commissioner's final decision and remanded the case for further proceedings, "it is the duty of . . . the agency from which appeal is taken . . . to comply with the mandate of the court and to obey the directions therein without variation and without departing from such directions." *Mefford v. Garnder*, 383 F.2d 748, 758 (6th Cir. 1967).  "Deviation from the court's remand order in the subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review." *Sullivan v. Hudson*, 490 U.S.

23

877, 886 (1989).

Here, Plaintiff argues that ALJ Vest – who considered Plaintiff's March 2006 application after Magistrate Judge White reversed and remanded ALJ Quigley's earlier decision – failed to comply with Magistrate Judge White's instruction to "fully explain the weight given to the opinions of *all* the State medical and psychological consultants of record." *Mischka*, 2010 WL 2759651 at * 7. Specifically, Plaintiff points to the opinion of consultative examiner Dr. Ulhaq, contending:

> Although [ALJ Vest] discussed Dr. Ulhaq's opinion, he never assigned a weight to it. Dr. Ulhaq opined that Plaintiff would be limited to a sedentary position because of his hip condition and that he was unable to spell or perform simple math due to mental retardation. None of these limitations are addressed in the [RFC].

(Plaintiff's Amended Brief ("Pl. Br.") at 13, Doc. No. 24.)

Review of ALJ Vest's decision reveals that, although ALJ Vest described Dr. Ulhaq's examination and observations, ALJ Vest did not assign a specific weight to Dr. Ulhaq's conclusions. (Tr. 48.)[2] The failure to do so technically violates Judge White's

---

[2] The Commissioner asserts that ALJ Vest "identified Dr. Ulhaq's opinion and rejected the basis of the opinion." (Respondent's Brief ("R. Br.") at 12, Doc. No. 22.) This is not an accurate description of ALJ Vest's opinion, as ALJ Vest did not analyze Dr. Ulhaq's conclusions or otherwise accept or reject them. The Commissioner also argues that substantial evidence supports ALJ Vest's assessment of Dr. Ulhaq's opinion because her opinion was inconsistent with the record as a whole. (Respondent's Response to Plaintiff's Amended Brief ("R. Res.") at 2-3, Doc. No. 25.) In addition to failing to address the legal issue raised by Plaintiff, this argument constitutes impermissible *post hoc* rationalization for ALJ Vest's conclusion, as ALJ Vest did not determine whether Dr. Ulhaq's conclusion was consistent with the record. *See Berryhill v. Shalala*, 4 F.3d 993, *6 (6th Cir. Sept. 16, 1993) (unpublished opinion) ("[T]he courts may not accept appellate counsel's *post hoc* rationalizations for agency action. It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.") (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (citation omitted)).

instructions on remand.[3]  This violation, however, does not merit remand in this case, as

Plaintiff does not demonstrate how the error caused him prejudice.  Plaintiff does not

explain how ALJ Vest's determination of Plaintiff's RFC would have been different had

ALJ Vest assigned specific weight to Dr. Ulhaq's conclusions.  Further, ALJ Vest

included limitations in Plaintiff's RFC that are  consistent with Dr. Ulhaq's conclusions.

ALJ Vest assigned Plaintiff the following RFC:

> [T]he [RFC] to perform light work as defined in 20 C.F.R.
> 404.1567(b), except that [Plaintiff] required the opportunity to
> change positions every 30 minutes; he could engage in only
> occasional bending and squatting, and no climbing; and he
> was limited to simple, repetitive, non-production oriented 1-,
> 2-, and 3- step job tasks.

(Tr. 47.)  Review of Dr. Ulhaq's conclusions regarding Plaintiff's limitations reveals that

Dr. Ulhaq did not assign Plaintiff any limitations that were more extreme than those

assigned by ALJ Vest.  Although Dr. Ulhaq opined that Plaintiff "has mental retardation,"

and required "further evaluation of mental retardation," he did not assign Plaintiff any

specific limitations with respect to his mental capabilities.[4]  Similarly, although he

---

[3] Plaintiff makes much of this error, describing ALJ Vest's failure to discuss the weight assigned to Dr. Ulhaq's opinion as "perpetuating that error that was found to be significant enough to warrant remand by Magistrate Judge Greg White."  (Pl. Br. at 13.) A review of Magistrate Judge White's decision, however, reveals that Judge White's discussion of this issue focused almost entirely on ALJ Quigley's failure to discuss Mr. Halas's finding that Plaintiff had a full scale IQ of 66, not on Dr. Ulhaq's physical findings.  *Mischka*, 2010 WL 2759651 at *6-7.  Indeed, Magistrate Judge White specifically mentioned that he was unable to "determine what weight, if any, [ALJ Quigley] ascribed to the IQ testing performed by Halas."  *Id*. at *7.

[4] This Court is not convinced that Dr. Ulhaq's observation that Plaintiff "has mental retardation," based only on Dr. Ulhaq's interaction with Plaintiff during a physical examination, is sufficient to even constitute a mental limitation, particularly as it is not clear from the record that Dr. Ulhaq is qualified to diagnose Plaintiff with any cognitive impairment or disorder.

concluded that Plaintiff required "a job where he can sit because of his hips," Dr. Ulhaq did not opine regarding a specific amount of time, or how often, Plaintiff would need to be able to sit in order to perform work.  ALJ Vest included mental limitations and physical limitations that are consistent with Dr. Ulhaq's broad conclusions regarding Plaintiff's abilities.  Given that ALJ Vest's RFC is consistent with Dr. Ulhaq's opinion, it is not clear from the record – and Plaintiff does not explain – how discussion of the weight assigned to Dr. Ulhaq's opinion would have changed the outcome in this case.  Accordingly, to the extent that ALJ Vest erred in his decision denying Plaintiff's March 2006 application on remand, that error did not prejudice Plaintiff, and remand is not necessary on this basis in this case.  *See Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) ("When 'remand would be an idle and useless formality,' courts are not required to 'convert judicial review of agency action into a ping-pong game.'") (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766, n.6 (1969)).

### 2.  ALJ Vest's Decision – Failure to Explain Omission of Dr. Ulhaq's Limitations

Plaintiff argues that ALJ Vest also erred in failing to explain his decision to omit the limitations assigned by Dr. Ulhaq from both his hypothetical to the VE and his determination of Plaintiff's RFC.  This argument lacks merit.

It is well established that, where the opinion of a medical source contradicts an ALJ's RFC finding, the ALJ must explain why he did not include its limitations in his determination of a claimant's RFC.  *See, e.g., Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (Lioi, J.) ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that

does not support his decision, especially when that evidence, if accepted, would change his analysis."); SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.").  Plaintiff contends that ALJ Vest erred in failing to explain why he omitted Dr. Ulhaq's limitations from his determination of Plaintiff's RFC.  However, as discussed above, the record reflects that Dr. Ulhaq's broad conclusions – that Plaintiff would need to be able to sit for an unspecified amount of time, and that he should be evaluated for mental retardation – do not contradict ALJ Vest's RFC.  Other than offering the conclusory assertion a contradiction exists, Plaintiff does not explain how ALJ Vest's determination of Plaintiff's RFC contradicts with Dr. Ulhaq's findings.  Accordingly, this argument presents no basis for remand in this case.

### 3. ALJ Andreas's Decision - *Drummond*

Plaintiff next argues that ALJ Andreas erred in concluding that, under the Sixth Circuit's decision in *Drummond*, he was bound by ALJ Vest's earlier findings .  In *Drummond*, the Sixth Circuit held that, "[a]bsent evidence of improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ."  126 F.3d at 842.  In the wake of the decision in *Drummond*, the Agency issued Acquiescence Ruling 98-4(6) ("AR 98-4(6)"), which explained how the Agency would apply the ruling to claimants whose cases arose in the Sixth Circuit:

> This Ruling applies only to disability findings in cases
> involving claimants who reside in Kentucky, Michigan, Ohio
> or Tennessee at the time of the determination or decision on
> the subsequent claim at the initial, reconsideration, ALJ
> hearing or Appeals Council level.  It applies only to a finding

27

of a claimant's [RFC] or other finding required at a step in the sequential evaluation process for determining disability under 20 CFR 404.1520, 416.920 or 416.924, as appropriate, which was made in a final decision by an ALJ or the Appeals Council on a prior disability claim.

When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision of an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in law, regulations or rulings affecting the finding or the method for arriving at the finding.

SSAR 98-4(6), 1998 WL 283902 (June 1, 1998).

Plaintiff's argument arises out of the fact that, by the terms AR 98-4(6), a subsequent ALJ is bound by the findings of a previous ALJ only when the previous ALJ's findings are contained in a *final* decision. Plaintiff notes that, at the time that ALJ Andreas issued his January 2012 decision denying Plaintiff's September 2009 application, Plaintiff's request for Appeals Council review of ALJ Vest's April 2011 decision was still pending. According to Plaintiff, because the Appeals Council had not acted on his request for review of ALJ Vest's decision, it was not final when ALJ Andreas issued his decision, and, thus, ALJ Andreas erred when he concluded that he was bound by ALJ Vest's earlier findings. The Commissioner disagrees, arguing that, under 20 C.F.R. § 404.984, ALJ Vest's decision was final because the Appeals Council never assumed jurisdiction in Plaintiff's earlier case. The Commissioner's argument lacks merit.

The relevant regulation, which is titled "Appeals Council review of administrative law judge decision in a case remanded by a Federal court," provides:

28

(a) General. In accordance with § 404.983, when a case is remanded by a Federal court for further consideration, the decision of the administrative law judge will become the final decision of the Commissioner after remand on your case unless the Appeals Council assumes jurisdiction of the case. The Appeals Council may assume jurisdiction based on written exceptions to the decision of the administrative law judge which you file with the Appeals Council or based on its authority pursuant to paragraph (c) of this section.

*  *  *

(b) You file exceptions disagreeing with the decision of the administrative law judge.

*  *  *

(2) If written exceptions are timely filed, the Appeals Council will consider your reasons for disagreeing with the decision of the administrative law judge and all the issues presented by your case. If the Appeals Council concludes that there is no reason to change the decision of the administrative law judge, it will issue a notice to you addressing your exceptions and explaining why no change in the decision of the administrative law judge is warranted. In this instance, the decision of the administrative law judge is the final decision of the Commissioner after remand.

20 C.F.R. § 404.984(a)-(b)(2).  This Court agrees that, under the terms of the

regulation, after remand, the decision of the subsequent ALJ becomes a final decision *if*

*and when* the Appeals Council declines review.  That is not, however, what happened in

this case.  In this case, Plaintiff's request for Appeals Council review of ALJ Vest's

decision was still pending ALJ Andreas issued his decision.[5]  The Appeals Council did

not deny Plaintiff's request for review (and decline to take jurisdiction) of ALJ Vest's

---

[5]  In his decision, ALJ Andreas mistakenly stated that Plaintiff had not sought review of ALJ Vest's decision.  (Tr. 17.)  The Commissioner does not dispute that Plaintiff timely sought Appeals Council review of ALJ Vest's decision.

decision until June 2013, more than one year after ALJ Andreas issued his decision.

The regulation does not address the circumstances of this case, where a claimant's request for review of an ALJ decision issued on remand is pending before the Appeals Council when a subsequent ALJ issues his decision. At least one court has determined that, where, after remand, a claimant requests Appeals Council review of the ALJ's subsequent decision, "the ALJ's decision does not become the final decision until the Appeals Council responds to the claimant's request for review." *Petty v. Astrue*, 550 F. Supp. 2d 1089, 1096 (D. Ariz. 2008). Other courts, including the Sixth Circuit, assume as much as a matter of course. *See Asbury v. Comm'r of Soc. Sec.*, 83 F. App's 682, 684 (6th Cir. 2003) ("The ALJ's decision became the Commissioner's final decision on Asbury's first application for benefits, pursuant to 20 C.F.R. § 404.984(b)(2), when the Appeals Council found no basis to assume jurisdiction in Asbury's exceptions to the decision."); *Weichers v. Colvin*, No. 1:13-CV-1574, 2014 WL 4425810 (D. Or. Sept. 8, 2014) ("Pursuant to [20 C.F.R. § 404.984(b), the ALJ's decision] became the final decision of the Commissioner . . . when the Appeals Council denied Plaintiff's subsequent request for review."). Plaintiff is correct in arguing that, at the time of ALJ Andreas's decision denying Plaintiff's September 2009 application for benefits, the decision of ALJ Vest was not final and, thus, ALJ Andreas was not bound by ALJ Vest's findings.

The Commissioner further argues that, even if ALJ Andreas mistakenly concluded that he was bound by ALJ Vest's findings, there was no prejudice to Plaintiff because ALJ Andreas made an independent evaluation of the evidence and determined that Plaintiff was not disabled. Plaintiff does not respond to this argument. A review of

ALJ Andreas's decision, however, reveals that, although he acknowledged ALJ Vest's findings, he also engaged in an independent review of all of the evidence of record. For example, this portion of ALJ Andreas's discussion of Plaintiff's limitations in daily living and social functioning is typical of his analysis of issues already considered by ALJ Vest:

> In activities of daily living, [Plaintiff] has a mild restriction. Although he does receive assistance from family members with cooking and cleaning, [Plaintiff] is able to care for his personal needs, perform household chores, prepare simple meals, and shop. ALJ Vest found [Plaintiff] has mild restrictions in daily living.

> In social functioning, [Plaintiff] has mild difficulties. [Plaintiff's] sister reported that [Plaintiff] has lived with several family members at different times, has always lived with a family member and that there have been "problems." [Plaintiff] did not report problems related to family members with whom he has lived. [Plaintiff] has not stated that he has difficulty getting along with others in the community or in previous employment. He has reported having many friends. ALJ Vest found [Plaintiff] has mild difficulties in social functioning.

> With regard to concentration, persistence and pace, [Plaintiff] has moderate difficulties. [Plaintiff] has indicated that he has difficulty understanding, following instructions, maintaining attention, and completing tasks. He does have sufficient ability to concentrate and attend to watch television and ride a bike. Mr. Halas found [Plaintiff] has sufficient ability to concentrate and maintain persistence and pace for simple, repetitive tasks. ALJ Vest found [Plaintiff] has moderate difficulties in maintaining concentration, persistence and pace.

(Tr. 22.)

Further, in addition to discussing the evidence that was not before ALJ Vest, ALJ Andreas discussed the medical opinions that were in the record at the time of Plaintiff's prior ALJ hearings. Indeed, much of ALJ Andreas's discussion of these

31

opinions is more detailed and exhaustive than the discussion of those opinions in ALJ Vest's decision. Nothing in the decision or the record suggests that ALJ Andreas would have made different findings absent his mistaken belief that he was bound by ALJ Vest's findings. Accordingly, the record does not demonstrate that Plaintiff was prejudiced by ALJ Andreas's error in applying *Drummond*, and this assignment of error presents no basis for remand in this case.

### 4. Appeals Council – Abuse of Discretion Allegation

Plaintiff argues that the Appeals Council erred when, in its June 2013 Notice, it failed to advise Plaintiff whether it had specifically considered his allegation that ALJ Andreas abused his discretion when he declined Plaintiff's request for additional IQ and behavioral testing. Plaintiff points to Social Security Ruling 13-1p ("SSR 13-1p") to support his argument, and contends that, under SSR 13-1p, because he made an allegation that ALJ Andreas abused his discretion, the Appeals Council was required to notify him whether it had considered that specific claim. Plaintiff's reliance on the ruling, however, is misplaced because SSR 13-1p does not address general allegations of abuse of discretion.

The title of SSR 13-1p is "Agency Processes for Addressing Allegations of Unfairness, Prejudice, Partiality, Bias, Misconduct, or Discrimination by Administrative Law Judges (ALJS)." SSR 13-1p, 2013 WL 633939 (SSA Jan. 29, 2013). The purpose of SSR 13-1p is to "clarif[y] the three separate processes we have for addressing allegations of unfairness, prejudice, partiality, bias misconduct, or discrimination by an ALJ." *Id.* at *2. The ruling provides that, "[i]f, in conjunction with a request for review, the Appeals Council receives an allegation of ALJ *unfairness, prejudice, partiality, or*

*bias*, the Appeals Council will review the claimant's allegations and hearing decision under an abuse of discretion standard." *Id*. at *3 (emphasis added).  Further, after review of such an allegation is complete, SSR 13-1p requires the Agency to "send the claimant a notice, order, or decision explaining that it *has considered the allegation under an abuse of discretion standard* and stating whether it found abuse of discretion." *Id*. at *4 (emphasis added).

The title and terms of SSR 13-1p reflect that the ruling is intended to address specific claims – that an ALJ has acted unfairly; demonstrated prejudice, bias or discrimination; or has engaged in some other type of misconduct.  SSR 13-1p does not apply to general claims of abuse of discretion.  Rather, it requires the Appeals Council to review the enumerated types of claims *under an abuse of discretion standard*, and to notify a claimant that it has done so.  Here, Plaintiff alleged only that ALJ Andreas abused his discretion in denying his request for additional medical testing.  He did not allege that ALJ Andreas had engaged in any of the conduct described in SSR 13-1p. Accordingly, the requirements of SSR 13-1p do not apply, and this argument presents no basis for remand in this case.

### 5.    New Evidence

Finally, Plaintiff argues that the January 2012 IQ testing analyzed by Mr. Lechowick[6] constitutes new evidence that warrants remand in this case.  Under 42 U.S.C. § 405(g), a court "may . . . remand [a] case to the Commissioner . . .  for further action by the Commissioner . . . and it may at any time order additional evidence to be

---

[6] Plaintiff refers to Mr. Lechowick as "Dr. Lechowick."  (Pl. Br. at 21.)  The record reflects, however, that he has neither a medical degree nor a Ph.D.  (Tr. 300.)

taken before the Commissioner . . . , but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  The party seeking remand under § 405(g) bears the burden of showing that remand is appropriate.  *See, e.g., Sizemore v. Sec. of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988).  "In order for the claimant to satisfy this burden of proof as to materiality, he must demonstrate that there was a reasonable probability that the Commissioner "would have reached a different disposition of the disability claim if presented with the new evidence."  *Id*.

Here, Plaintiff has not met his burden of proof with respect to materiality. Plaintiff argues that the results of the January 2012 are new and material because they demonstrate that Plaintiff satisfies Listing 12.05(C) of the Listing of Impairments, which provides the criteria for determining that a claimant is disabled on the basis of intellectual disability.  Listing 12.05(C):

> 12.05 Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22 [and]
>
> *  *  *
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.05C.

The testing analyzed by Mr. Lechowick revealed a full scale IQ of 73, which is greater than the IQ limit set forth in Listing 12.05(C).  Further, ALJ Andreas considered the initial requirement for Listing 12.05 – that significantly subaverage intellectual

34

functioning initially manifested itself prior to age 22 – and determined that Plaintiff failed to satisfy this initial requirement because the record did not reflect that he had been diagnosed with mental retardation prior to age 22, or that he had received special education services in school.  (Tr. 23-24.)  ALJ Andreas noted the result of IQ testing performed by Mr. Halas in July 2006, which reflected a full scale IQ of 66.  (Tr. 23.)  Given, however, that the record lacked evidence that Plaintiff satisfied the initial requirement of Listing 12.05, ALJ Andreas concluded that Plaintiff did not satisfy Listing 12.05(C).  (Tr. 24.)  The January 2012 test results proffered by Plaintiff as new evidence reflect a higher full scale IQ than permitted by Listing 12.05(C).  They do not undermine ALJ Andreas's reasons for concluding that Plaintiff did not satisfy the initial requirement of Listing 12.05.  There is no basis for concluding that the outcome of Plaintiff's disability claim would have been different had Plaintiff presented these test results.  Accordingly, there is no basis to remand this case to the agency.

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decisions be AFFIRMED.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: September 29, 2014

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District**

**Court's order.**  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).